IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Carol J. BROWN, Attorney at Law:

OFFICE OF LAWYER REGULATION, Complainant,

v.

Carol J. BROWN, Respondent.

Supreme Court

*No. 2009AP1678–D. Decided August 18, 2010.*

2010 WI 104

(Also reported in 787 N.W.2d 800.)

23

¶ 1. PER CURIAM. We review the report and recommendation of the referee, the Honorable Timothy L. Vocke, that Attorney Carol J. Brown receive a public reprimand, pay restitution, and bear the full costs of this proceeding. No appeal has been filed so we review the referee's report and recommendation pursuant to SCR 22.17(2).[1] A referee's findings of fact will not be overturned unless clearly erroneous. *See In re Disciplinary Proceedings Against Carroll,* 2001 WI 130, ¶ 29, 248 Wis. 2d 662, 636 N.W.2d 718. We independently review the referee's legal conclusions. *Id.*

¶ 2. We approve and adopt the referee's findings of fact and conclusions of law. We agree that Attorney Brown's professional misconduct warrants a public reprimand, and we find it appropriate to require Attorney

---

[1] SCR 22.17(2) provides:

If no appeal is filed timely, the supreme court shall review the referee's report; adopt, reject or modify the referee's findings and conclusions or remand the matter to the referee for additional findings; and determine and impose appropriate discipline. The court, on its own motion, may order the parties to file briefs in the matter.

Brown to pay restitution and the costs of this disciplinary proceeding as set forth herein.

¶ 3. Attorney Brown (formerly known as Carol Brown Biermierer) was admitted to the practice of law in Wisconsin in 1993. She has not previously been disciplined. During the events relevant to this proceeding, she practiced in Madison with the law firm Brown & La Counte, LLP ("the Firm"), specializing in legal matters affecting Native American tribes and their members.

¶ 4. The Office of Lawyer Regulation (OLR) filed a disciplinary complaint against Attorney Brown on July 3, 2009, alleging seven counts of professional misconduct. All of the allegations of misconduct relate to the Firm and Attorney Brown's representation of the Saginaw Chippewa Indian Tribe of Michigan, a federally recognized Indian tribe ("the Tribe"). Attorney Brown was lead counsel for the Firm's representation related to the Tribe. Attorney Brown filed an answer to the OLR's complaint, but the parties then entered into a stipulation whereby Attorney Brown withdrew her answer and pled no contest to the allegations set forth in the complaint pursuant to SCR 22.14(2). A hearing was held before the referee on March 4, 2010. The referee accepted the stipulation and issued his report and recommendation on March 15, 2010.

¶ 5. We begin our discussion by noting the referee observed that many "of the problems that Attorney Brown got into in this case were as a direct result of the contentiousness between various interests in the tribe and the instability of the tribal government." The referee explicitly considered this a mitigating factor. While this does not excuse misconduct, it does inform our review of this proceeding. The parties have stipu-

lated to the facts set forth in the complaint, so we will merely summarize the complex factual basis underlying this proceeding.

¶ 6. In March 1998 the Firm entered into a written contract with the Tribe for legal services ("the Contract"). The Contract was signed by Attorney Brown on behalf of the Firm. The Contract stated the Firm agreed to represent the Tribe, and not the then-serving governing council, its members, or any particular persons within the Tribe. The Tribe's constitution required the Tribe to submit the Contract to the Bureau of Indian Affairs ("BIA") for approval. BIA refused to approve the Contract, requesting inclusion of specific language relating to fees and costs to be billed by the Firm. In March 1999 the Firm prepared and executed a revised contract which was provided to the Tribe. The Tribe filed the revised Contract with BIA in August 1999. However, a new governing council took control of the Tribe's government, and the Tribe then requested that BIA not approve the revised Contract. The revised Contract was never approved by BIA.

¶ 7. At the time the Firm was retained by the Tribe, there was controversy within the Tribe as to whether all of the persons listed on the Tribe's membership rolls were proper members of the Tribe. There also ensued a series of disputes about election results. There was disagreement as to whether then-serving members of the Tribe's governing council ("the Chamberlain Council") and then-serving Chief Kevin Chamberlain were legitimately elected representatives of the Tribe. Between 1996 and 1999, the Tribe experienced a series of elections, election protests, and subsequent invalidation of election results by the Chamberlain

Council.[2] Between November 1997 and August 1999, the members of the Chamberlain Council continued to hold office as a "holdover" government, instead of turning over the reins of the Tribe's government to the persons elected in the invalidated elections.

¶ 8. Eventually, several tribal members filed suit in tribal court, *Peters, Durfee v. Chamberlain, et al.,* Case No. 98–CI-361. The tribal court held that the Chamberlain Council had the power to void the election results, but ordered the Chamberlain Council to develop a plan to allow the Tribe to hold a valid election. Following this decision, tribal members began actively seeking intervention from Kevin Gover ("Gover"), then-Assistant Secretary of the Interior. Gover urged the Chamberlain Council to hold elections for a properly elected council. Ultimately, the Chamberlain Council failed to hold elections in the time and manner required by Gover. Gover then directed his subordinates to withdraw federal recognition of all but two members of the Chamberlain Council. Gover recognized an "Interim Council" which included Interim Chief Peters and two persons who had served as members of the Chamberlain Council. The Interim Council took control of the government of the Tribe.

¶ 9. On August 11, 1999, Interim Chief Peters wrote to Attorney Brown and advised the Firm:

> As you no doubt know, a new Saginaw Tribal Council took office yesterday . . . . [Y]ou currently do not have a valid contract [with the Tribe], and you do not represent the Saginaw Tribal Council or the Saginaw

---

[2] One of the points of controversy within the Tribe was whether Philip Peters, Sr., who was elected Chief in at least one of the invalidated elections, and several other persons elected to serve on the council, were proper members of the Tribe.

Chippewa Tribe. The Council has voted to rescind the former council's approval of your contract and its request for Bureau approval. Therefore, effective as of this date you are to cease all work for the Saginaw Tribal Council and the Saginaw Chippewa Tribe and cease holding yourself out as attorneys for either.

¶ 10. In August 1999 the Firm, on behalf of Chamberlain and five of the other deposed Chamberlain Council members, filed an action in the Appellate Court of the Tribe, pursuant to its original jurisdiction, to attempt to block Gover's directive from taking effect and to restore the deposed Chamberlain Council members to power. *Chamberlain, et al. v. Peters, et al.*, Case No. 99–CI-771 (Appellate Court of the Saginaw Chippewa Indian Tribe of Michigan).

¶ 11. On August 16, 1999, the Firm filed an action in the United States District Court for the Eastern District of Michigan, purporting to represent the Tribe, seeking a declaratory judgment and an injunction preventing Gover's decision from taking effect. *Saginaw Chippewa Indian Tribe of Michigan v. Gover, et al.*, Case No. 99–CV-10327 (E.D. Mich.).[3]

¶ 12. In October and November 1999 the Interim Council held "curative elections," resulting in the Interim Council members being elected in November 1999 to regular two-year terms. Despite several protests and legal challenges, the Interim Council allowed the certified election results to stand. The newly elected council members (comprised of the same members as the Interim Council, including newly elected Chief

---

[3] The Interim Council directed the Tribe's general counsel, Attorney Michael G. Phelan, to intervene in the suit, also in the name of the Tribe, in an effort to prevent an injunction from being issued. On August 19, 1999, the district court denied the Tribe's request for a temporary restraining order.

Philip Peters, Sr., and two members of the former Chamberlain Council) took the oath of office on December 7, 1999 ("the Peters Council").

¶ 13. On January 5, 2000, the Appellate Court of the Tribe held that Gover had no legal authority under tribal or federal law to intervene in the Tribe's dispute or to determine the Tribe's government. *Chamberlain, et al. v. Peters, et al.,* 27 ILR 6085. However, the Appellate Court denied the deposed Chamberlain Council members any relief based on that judgment, in part because of the deposed members' own illegal actions in holding over beyond their terms and in part because the Peters Council members had been validly elected in November 1999, took the oath of office in December 1999, and thereby formed the legitimate government of the Tribe under tribal law. *Id.*

¶ 14. On February 11, 2000, the federal district court dismissed the suit pending in that court (*Saginaw Chippewa Indian Tribe of Michigan v. Gover, et al.*), finding that the decision of Appellate Court of the Tribe in *Chamberlain, et al. v. Peters, et al.* deprived the district court of jurisdiction.

¶ 15. The Firm, purporting to act on behalf of the Tribe but acting at the direction of some of the deposed Chamberlain Council members, filed a motion asking the district court to amend the dismissal order to allow the Firm to file a second amended complaint and brief, which the district court also denied. The Firm then filed with the Sixth Circuit Court of Appeals an appeal of the district court's dismissal of the action, again purporting to act on behalf of the Tribe. On July 6, 2000, the appeal was dismissed by stipulation.

¶ 16. Thus, between August 11, 1999, and December 7, 1999, the Firm represented the interests of some

29

of the deposed Chamberlain Council members in actions contrary to the Interim Council's governance of the Tribe. Between December 7, 1999, and July 6, 2000, the Firm represented the interests of some of the deposed Chamberlain Council members in actions contrary to the Peters Council's governance of the Tribe. Ultimately, the referee concluded that:

> [B]y representing or causing or allowing her firm to represent the interests of some of the deposed members of the Chamberlain Council in *Chamberlain, et al. v. Peters, et al.*, Case No. 99–CI-771 (Appellate Court of the Saginaw Chippewa Indian Tribe of Michigan), in *Saginaw Chippewa Indian Tribe of Michigan v. Gover, et al.*, Case No. 99–CV-10327 (E.D. Mich.), and in an appeal from the dismissal thereof in Case No. 00–1395 (6th Cir.); [and] by representing or causing or allowing her firm to represent Gloria King in her efforts to cause the Secretary of the Interior to call an election regarding proposed amendments to the Tribe's constitution, including representing King in *King v. Norton, et al.*, Case No. 00–CV-10006 (E.D. Mich.), and in related advocacy before BIA; and by engaging in the aforementioned courses of conduct when in each such case the representation was materially adverse to the interests of the former client (the Tribe), when in each such case the representation involved the same or a substantially related matter to the representation of the former client, and when in each such case written consent was not obtained from the former client to the representation, [Attorney] Brown violated former SCR 20:1.9(a).[4]

---

[4] Former SCR 20:1.9(a) (effective through June 30, 2007) provided that a lawyer who has formerly represented a client in a matter shall not "represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents in writing after consultation; . . . ."

There is no evidence these factual findings are clearly erroneous, and we agree with this conclusion of law.

¶ 17. On August 11, 1999, Interim Chief Peters sent a letter to Attorney Brown stating, "Please send us an immediate accounting of all of the work you have done on behalf of the Tribe and the Council, along with all related billing records . . . ." The Firm did not respond until May 11, 2000. Moreover, the May 11 letter did not provide or include an accounting to the Tribe and only included billing statements for one and one-half months. Chief Peters replied to this letter on July 21, 2000, stating:

> I have received and reviewed your May 11, 2000 letter responding to my letter of August 11, 1999 . . . . [Y]our May 11, 2000, letter does not respond to my request for a full accounting and a release of all billing materials. You provided no accounting and provided only billing statements for July 1999 and August 1-10, 1999. I am, therefore, again requesting that you provide the information and materials I requested last August including but not limited to the following: . . . A full accounting of all transactions into and from the Saginaw Chippewa Tribe's Client Trust Account with your firm; . . . . A full accounting of all payments made to the firm from the $150,000.00 paid to the firm on or about July 28, 2000 purportedly to "replenish" the Saginaw Chippewa Tribe's Client Trust Account; . . . The production of billing records for services purportedly rendered to the Saginaw Chippewa Tribe from the inception of your relationship with the Tribe to the present.

¶ 18. Attorney Brown responded on July 28, 2000, enclosing copies of the Firm's statements for legal services to the Tribe from March 1998 through June 1999, as well as a copy of the Firm's "actual Trust Account ledger sheets," and "[f]or purposes of clarity . . . an Excel Worksheet of the ledger accounts." However,

31

there were numerous accounting errors in this paperwork. In Attorney Brown's July 28, 2000, letter to Chief Peters, the Firm misrepresented that the Tribe owed the Firm an additional $69,816.93. In fact, the Firm owed monies to the Tribe. The OLR's subsequent investigation determined that the office manager's calculations of the amounts received by the Firm from the Tribe, which were also included in the July 28, 2000, letter, were not accurate because Attorney Brown recorded activity on the Firm's client ledgers and check stubs inaccurately and because whoever prepared the letter failed to accurately calculate the total funds due.

¶ 19. The referee concluded, and we agree, that by failing, prior to July 28, 2000, to provide or to cause her firm to provide the Tribe with a full accounting of the advanced fees and costs delivered to the Firm by the Tribe prior to August 11, 1999, when the Tribe had requested a full accounting in August 1999 and May 2000, Attorney Brown violated former SCR 20:1.15(b).[5]

¶ 20. The OLR investigation also disclosed trust account anomalies and other problems with accurate financial disclosure, as well. On two occasions in 1999 Attorney Brown disbursed more funds than the Firm held in trust. When she became aware of the negative

---

[5] SCR 20:1.15(b) (effective through June 30, 2004) provided as follows:

> Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person in writing. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render a full accounting regarding such property.

trust account balance, she arranged to draw on the Firm's line of credit to deposit $59,674.48 of Firm funds in the trust account on August 2, 1999. She inaccurately misrepresented the disbursement of funds to the Firm on client ledgers for the Tribe as "repayments" of a loan or advance to the Tribe from the Firm. She caused the Firm to commingle between $15,953.40 and $16,899.43 of Firm funds with client funds in the trust account. The trust account records and Attorney Brown's July 28, 1999, letter show that as of July 29, 1999, Attorney Brown believed the Tribe owed the Firm fees in excess of $42,749.85 and mistakenly believed the Firm had more than $42,749.85 of Tribe funds in the trust account.

¶ 21. The referee concluded, and we agree, that by causing the Firm to use client funds held in trust to satisfy disbursements unrelated to the clients' matters and commingle at least $15,953.40 of Firm funds in the trust account for more than three months, Attorney Brown violated former SCR 20:1.15(a).[6] In addition, by causing or participating with the Firm to send trust account ledgers to the Tribe which misrepresented the Firm had made a loan to the Tribe and that several disbursements from the trust accounts to the Firm represented repayments of that loan, when the Firm had not made a loan to the Tribe, Attorney Brown vio-

---

[6] SCR 20:1.15(a) (effective through June 30, 2004) provided, in pertinent part: Safekeeping property.

(a) A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and third persons that is in the lawyer's possession in connection with a representation or when acting in a fiduciary capacity. . . . No funds belonging to the lawyer or law firm, except funds reasonably sufficient to pay or avoid imposition of account service charges, may be deposited in such an account.

lated SCR 20:8.4(c).[7] By disbursing or causing the Firm to disburse $109,325.03 from the Firm's trust accounts prior to providing written notice of the intended disbursements to the Tribe, Attorney Brown violated SCR 20:8.4(f)[8] via *In re Disciplinary Proceedings Against Marine*, 82 Wis. 2d 602, 264 N.W.2d 285 (1978).

¶ 22. The OLR investigation revealed issues pertaining to billing and staffing, as well. It is undisputed that Attorneys Brown and La Counte were the sole partners of the Firm.[9] In August 1998 pursuant to a written contract, the Firm hired Arizona-based attorney Robert J. Lyttle ("Lyttle") as a "contract attorney to assist [the Firm] in matters related to the Saginaw Chippewa Constitution Project." Billing records and the Firm's contract with Lyttle show the Firm paid Lyttle $90 per hour for legal services he performed related to the Tribe and $55 per hour for his related travel time. The Firm billed the Tribe $125 per hour for Lyttle's work and travel time. However, the Firm did not obtain the Tribe's written agreement to the markup or the arrangement with Lyttle. The Tribe calculated that during the course of the Firm's representation of the Tribe, Lyttle billed the Firm a total of $106,040 ($69,696 for his services and $36,344 in related travel time). The Firm billed the Tribe a total of $179,400 for the same work and services. The additional net to the

---

[7] SCR 20:8.4(c) states it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

[8] SCR 20:8.4(f) provides it is professional misconduct for a lawyer to "violate a statute, supreme court rule, supreme court order or supreme court decision regulating the conduct of lawyers; . . . ."

[9] The Firm also employed three associate attorneys and a part-time law clerk.

34

Firm for Lyttle's work and travel time between approximately August 21, 1998, and August 10, 1999, was $73,360. The division of the fees billed to the Tribe for Lyttle's work and travel time was not divided between the Firm and Lyttle based on the proportion of work performed by the Firm and Lyttle for such amounts. The Firm charged a "markup" on the rate the Firm would pay contract attorneys compared to the rate at which the Firm billed the client for the contract attorney's services. The Firm generally did not notify the clients of the differences in the rates the Firm paid to the contract attorney versus the rates billed to the clients for the work of contract attorneys.

██

¶ 23. Ultimately, the referee concluded, and we agree, that by causing or allowing the Firm to charge the Tribe markups of $35 per hour on services provided and $70 per hour on travel time by Lyttle, when such markups were not proportionate to the services performed by Lyttle and where the Firm failed to disclose the compensation arrangement with Lyttle and failed to obtain the Tribe's written agreement to the markup or the fee arrangement with Lyttle, Attorney Brown violated former SCR 20:1.5(e).[10]

---

[10] Former SCR 20:1.5(e) (effective through June 30, 2007) provided:

A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved and is informed if the fee will increase as a result of their involvement; and

(3) the total fee is reasonable.

██

¶ 24. In addition, Attorney La Counte's husband, Richard A. Monette ("Monette"), was an attorney licensed to practice law in North Dakota but not licensed to practice law in Wisconsin. Monette had an association with the Firm whereby he brought clients to the Firm and provided legal and consulting services to Firm attorneys and to Firm clients. The Firm paid him a portion of the fees charged by the Firm for his services, and he was paid a percentage of all fees charged by the Firm for certain other cases he brought to the Firm. Monette was not, however, an employee, associate, or partner of the Firm. Nonetheless, Monette held himself out as "of counsel" to the Firm on his University of Wisconsin Law School online information page and was described as "of counsel" in at least one brief filed in the Tribe's litigation.[11] The referee found that Attorney Brown took no steps to clearly and accurately communicate to clients, prospective clients, courts, and agencies before which Monette appeared on behalf of the Firm, opposing counsel, or the general public that Monette was not an employee, associate, or partner of the Firm. The referee concluded, and we agree, that by allowing Attorney Richard Monette to hold himself out as an employee, associate or partner of the Firm, Attorney Brown violated SCR 20:7.5(d)[12] via SCR 20:8.4(a).[13]

---

[11] For example, on September 3, 1999, in the *Saginaw Chippewa Indian Tribe of Michigan v. Gover, et al.,* litigation pending in federal court, the Firm filed a First Amended Complaint signed by Monette on behalf of the Firm. This pleading failed to include any language clarifying Monette's relationship with the Firm, thereby holding him out as an employee, associate or partner of the Firm.

[12] SCR 20:7.5(d) provides, "Lawyers may state or imply that they practice in a partnership or other organization only when that is the fact."

[13] SCR 20:8.4(a) states it is professional misconduct for a

¶ 25. The OLR ascertained that the Tribe was entitled to restitution in the amount of $73,360 and split this restitution obligation between the Firm's two partners.[14] The parties thus stipulated that Attorney Brown owes restitution in the principal amount of $36,680 to the Saginaw Chippewa Indian Tribe of Michigan.

■

¶ 26. We adopt the referee's findings of fact and conclusions of law with respect to each allegation of misconduct. We agree the appropriate discipline to be imposed against Attorney Brown is a public reprimand, together with an order that Attorney Brown pay restitution in the principal amount of $36,680 to the Saginaw Chippewa Indian Tribe of Michigan and pay the costs of this proceeding.

¶ 27. With respect to how restitution and costs should be paid, we are guided by the referee's insightful observations. He noted, "It's clear that, over the course of the last several years, what was once a thriving and lucrative legal business became defunct to the point where the two principals of [the Firm] have split; . . . ." The referee noted Attorney La Counte obtained a full-time job with the Ho-Chunk Nation, leaving Attorney Brown with a business loan totaling approximately $40,000. The referee accepted as practical, reasonable, and fair Attorney Brown's proposal with respect to payment of her restitution obligation. We agree. Consistent with the referee's recommendation, we direct Attorney Brown to pay $5,000 toward restitution on

lawyer to "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . . ."

[14] Attorney La Counte, in the form of a consensual public reprimand, agreed to a payment plan to pay $36,680.

March 4, 2011. She will "pay that exact amount on each anniversary [i.e. March 4] until 2017." On March 4, 2018, Attorney Brown will pay the remaining $1,680 plus half of the costs.[15] On March 4, 2019, she will pay the remaining half of the costs.

¶ 28. IT IS ORDERED that Carol J. Brown is publicly reprimanded as discipline for professional misconduct.

¶ 29. IT IS FURTHER ORDERED that Carol J. Brown pay restitution to the Saginaw Chippewa Indian Tribe of Michigan in the total sum of $36,680 on the payment schedule set forth in the body of this decision. If the restitution payments are not made, and absent a showing of her inability to pay, Carol J. Brown's license to practice law in Wisconsin shall be suspended until further order of the court.

¶ 30. IT IS FURTHER ORDERED that Carol J. Brown pay to the Office of Lawyer Regulation the costs of this proceeding on the payment schedule set forth in the body of this decision. If costs are not paid within the time specified, and absent a showing of her inability to pay, Carol J. Brown's license to practice law in Wisconsin shall be suspended until further order of the court.

¶ 31. IT IS FURTHER ORDERED that the restitution is to be paid in full prior to paying costs to the Office of Lawyer Regulation.

---

[15] The costs in this matter are $6,727.75 as of March 31, 2010.