**The PEOPLE of the State of Colorado, Complainant,**

**v.**

**Juliet Carol GILBERT, Respondent.**

**No. 12PDJ085.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

July 17, 2013.

## OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)

On May 21 and 22, 2013, a Hearing Board composed of W. Eric Kuhn and B. Lawrence Theis, members of the bar, and William R. Lucero, the Presiding Disciplinary Judge ("the PDJ"), held a hearing pursuant to C.R.C.P. 251.18. Adam J. Espinosa appeared for the Office of Attorney Regulation Counsel ("the People"), and Nancy L. Cohen appeared on behalf of Juliet Carol Gilbert ("Respondent"). The Hearing Board now issues this "Opinion and Decision Imposing Sanctions Pursuant to C.R.C.P. 251.19(b)."

### I. *SUMMARY*

In the course of representing clients in an immigration case, Respondent commingled unearned legal fees with her personal funds and unintentionally used those fees for her own purposes. Through this conduct, Respondent violated Colo. RPC 1.15(a), 1.15(c), and 1.5(f). The Hearing Board cannot find by clear and convincing evidence, however, that Respondent knowingly converted unearned fees in contravention of Colo. RPC 8.4(c). We also cannot conclude that she failed to provide a proper accounting to her clients or failed to refund unearned fees in violation of Colo. RPC 1.15(b) or 1.16(d). Taking into account both the gravity of Respondent's actions and the extensive mitigating factors present, the Hearing Board concludes that the appropriate sanction is a three-month suspension, all stayed upon successful completion of a six-month period of probation, with conditions.

### II. *PROCEDURAL HISTORY*

The People filed their complaint in this matter on November 29, 2012, alleging that Respondent violated Colo. RPC 1.5(f), 1.15(a), 1.15(b), 1.15(c), 1.16(d), and 8.4(c). Respondent filed her answer on February 4, 2013.

On March 26, 2013, Respondent filed a motion in limine asking the PDJ to preclude the introduction of evidence concerning a foreclosure action initiated, and later dismissed, against her in Jefferson County District Court. The PDJ denied the motion, ruling that Respondent's financial circumstances were relevant to the People's Colo. RPC 8.4(c) claim and to the Hearing Board's sanctions analysis, and that such evidence was not overly prejudicial.

On April 22, 2013, the PDJ granted the People's motion to disqualify John M. Lebsack from the Hearing Board after he disclosed that his firm, White and Steele, P.C., retained Nancy Cohen in the past year and contemplates retaining her in the future.

Respondent moved for partial summary judgment on March 26, 2013, seeking judgment in her favor on the claims premised upon Colo. RPC 1.15(b), 1.16(d), and 8.4(c). Upon review of the People's response and Respondent's reply, the PDJ denied the motion on May 10, 2013, finding the motion presented mixed questions of law and fact rendering summary judgment inappropriate.

Respondent moved for a protective order on May 2, 2013, asking the PDJ to seal approximately one hundred pages of her business and personal checking account records, which the People attached as exhibits to two pleadings. The PDJ granted the motion on May 16, 2013, finding Respondent had demonstrated good cause to protect these otherwise confidential documents in accordance with C.R.C.P. 251.31(e).

On May 17, 2013, the People filed a motion to strike certain portions of Respondent's hearing brief and legal authority. The PDJ conducted a brief hearing on the motion on May 20, 2013, and ruled that Respondent's citation to diversion agreements and stipulated admissions of misconduct contravened section V–4 of the at-issue conference order

in this matter. Accordingly, the PDJ instructed the Hearing Board to disregard those authorities.

During the disciplinary hearing, Respondent, Christopher Henderson, Victoria Peters, and Laurel Herndon testified, and the Hearing Board considered the stipulated facts, stipulated exhibits 1–22, the People's exhibits 26–29, and Respondent's exhibit C. In accordance with the protective order granted on May 16, 2013, the PDJ **SEALS** exhibit 27.

### III. *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on June 14, 1995, under attorney registration number 25640.[1] She is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[2]

### Initial Meeting and Fee Agreement

Since 2005, when she left a long-standing teaching position at the University of Colorado Law School, Respondent has run a solo law firm in Westminster, where she primarily practices immigration law.[3]

In May 2011, Christopher Henderson ("Henderson") and his wife, Victoria Peters, a/k/a Victoria Henderson ("Peters"),[4] retained Respondent.[5] Henderson, a U.S. citizen by birth, previously married Carmen Sanchez, a Dominican Republic national, in 1996.[6] Although U.S. Citizenship and Immigration Services ("USCIS") determined that the marriage was a sham, Henderson and Sanchez did not terminate or annul their marriage.[7]

Nevertheless, in 2004 Henderson married Peters, a Trinidad and Tobago national who

---

1. Respondent's registered business address is 8671 Wolff Court, # 260, Westminster, Colorado 80031.

2. *See* C.R.C.P. 251.1(b).

3. She previously worked for two state attorneys general, a legal assistance foundation, and the Southern Methodist University Law School.

4. Victoria Peters testified that it is appropriate to refer to her by the last name of Peters.

5. Stip. Facts ¶ 2.

6. Stip. Facts ¶¶ 3, 5.

7. Stip. Facts ¶¶ 6–7.

had entered the United States on a visitor's visa four years earlier.[8] Henderson filed an I–130 "Petition for Alien Relative" in 2004, seeking to have Peters classified as his spouse so she could become a lawful permanent resident.[9] In the petition, Henderson did not disclose his sham marriage to Sanchez.[10] After conducting interviews and a site visit, USCIS determined that Peters and Henderson had married solely in order to obtain lawful status for Peters.[11] Accordingly, USCIS initiated removal proceedings against her.[12]

Peters and Henderson met with Respondent to discuss the removal case on May 23, 2011, a week before Peters's first appearance before the court at a master calendar hearing.[13] They paid Respondent a $100.00 consultation fee.[14] At the meeting, Respondent advised them that Peters had no relief available other than voluntary departure. Respondent explained, however, that if Henderson filed a second I–130 petition on Peters's behalf, the immigration court would stay the removal case until adjudication of the petition. Respondent also said that Henderson could not file the I–130 petition until his marriage to Sanchez had been terminated or annulled. At the disciplinary hearing, Respondent testified that she was particularly concerned about this aspect of the case because Henderson said he had been unable to serve Sanchez when he previously filed for annulment. Respondent also advised Peters and Henderson to begin gathering evidence, such as leases, bank accounts, and letters from friends, showing they were in a bona fide marriage.

During the meeting, Respondent showed Peters and Henderson a list of her standard legal fees for various immigration-related services.[15] The fee list indicated that she charged an hourly rate of $250.00 for "miscellaneous immigration and consumer rights cases."[16] Although Respondent testified her normal rate for cases like Peters's was $5,000.00, she offered to represent Peters for a flat fee of $3,550.00, which included $50.00 for photocopying and postage.

The next day, Respondent sent Peters and Henderson a fee agreement, which they signed on May 25, 2011.[17] The fee agreement reiterated the legal advice Respondent had given them at their meeting and provided that, for her $3,550.00 fee, she would represent Peters before the immigration court, assist the couple in preparing a second I–130 petition, and accompany Peters to her interview with USCIS.[18] An initial payment of $2,000.00 was due by May 27, 2011, and the remaining balance was due in five payments, with $350.00 due by June 27, 2011, and $300.00 due by the twenty-seventh day of the next four months.[19]

The fee list Respondent had shown Peters and Henderson at their meeting was not part of the written fee agreement. The fee agreement also did not explain what payment, if any, would be due if the representation ended before Respondent completed all three tasks she agreed to perform. Peters and Henderson both recall Respondent saying she would not begin any legal work for them until she received the full $3,550.00 fee. Respondent denies making any such statement, however, and Peters's and Henderson's testimony was inconsistent with their statements that they expected Respondent to represent Peters at the master calendar hearing in late May 2011.

8. Stip. Facts ¶ 3.

9. Stip. Ex. 3.

10. Stip. Facts ¶¶ 5–6.

11. Stip. Facts ¶ 9; Stip. Ex. 3.

12. Stip. Ex. 2. These proceedings were held before the immigration court in Denver, which is administered by the U.S. Department of Justice Executive Office for Immigration Review.

13. Stip. Facts ¶¶ 4, 10.

14. Stip. Facts ¶ 10; Stip. Ex. 6.

15. *See* Stip. Ex. 4.

16. Stip. Ex. 4.

17. Stip. Facts ¶ 11; Stip. Ex. 5. For purposes of this opinion, we assume that Henderson, in addition to Peters, was Respondent's client.

18. Stip. Ex. 5.

19. Stip. Ex. 5.

## Legal Services and Communication

Respondent appeared in immigration court for Peters's master calendar hearing on May 31, 2011, before a judge who Respondent believes respects her. She moved for a continuance to buy time for preparation of the second I–130 petition. Respondent testified that counsel for USCIS could have raised a well-grounded objection to a continuance but did not do so. The court reset the hearing for March 2012. Although the hearing was brief, several matters were set at the same time, so Respondent was at the courthouse for about an hour, which included a short meeting with her clients after the hearing.

Little happened in Peters's immigration case over the summer of 2011. Respondent sent Peters a short letter on June 8, 2011, enclosing notice of the March 2012 hearing and asking for updates about the status of Henderson's annulment case.[20] Respondent also spent forty minutes researching annulment and marriage fraud issues in June.[21] In late June, and once again in late July, Respondent wrote brief letters to Peters, asking whether Henderson had found a lawyer to handle the annulment case and reminding Peters of the next payment due.[22] Peters and Henderson did not respond to Respondent's queries about the annulment case.

In August, Respondent spoke with Peters about scheduling a meeting, explaining that she wanted to begin preparing the second I–130 petition and reviewing evidence that would demonstrate the bona fides of the marriage. Peters told Respondent that she and her husband would only be available to meet on a Saturday, so a meeting was scheduled for Saturday, August 20, 2011, and Respondent spent fifteen minutes reviewing the I–130 petition and researching how to establish a bona fide marriage just before the meeting.[23] Peters and Henderson did not show up for the meeting, however. Respondent wrote to them two days later, asking them to call in the future if they could not keep an appointment and reminding them of their upcoming payment.[24] Peters apologized in a letter, saying a family emergency required Henderson to travel out of state and they would contact Respondent to set another meeting once he returned to Colorado.[25] Peters and Henderson contend that over the next two months they were unable to reach Respondent, but Respondent disagrees, claiming her clients were the unresponsive party. We find Respondent's testimony on this point more credible.

## Payment and Consumption of Fees

Peters and Henderson paid Respondent $2,000.00 on May 27, 2011.[26] They paid the first installment of $350.00 one day late, on June 28, 2011, and sent the next installment of $300.00 five days late, on August 1, 2011.[27] They timely paid the third installment of $300.00 but then discontinued making payments.[28] In total, they paid Respondent $2,950.00 toward her flat fee.[29]

During the representation, Respondent maintained three accounts at Valley Bank & Trust: a business checking account, a COLTAF trust account,[30] and a personal checking account.[31] Between May and December 2011, Respondent essentially did not use her personal account. Its starting balance was $6.47, and after a $5.00 debit, its ending

---

20. Stip. Ex. 8.

21. Stip. Ex. 1.

22. Stip. Exs. 9 & 11.

23. Stip. Ex. 1.

24. Stip. Ex. 12.

25. Stip. Ex. 13.

26. Stip. Facts ¶ 14; Stip. Ex. 7. At the hearing, Henderson characterized all funds paid to Respondent as his own money, not the couple's shared money.

27. Stip. Facts ¶ 19.

28. Stip. Facts ¶ 19.

29. Stip. Facts ¶ 20.

30. A COLTAF (Colorado Lawyer Trust Account Foundation) account is an interest-bearing account for certain client funds. The interest on lawyers' COLTAF accounts is used to support access to civil justice in Colorado. See Colo. RPC 1.15(h).

31. Ex. 27 at 214.

balance was $1.47.[32] Respondent did not at any time during her representation of Peters and Henderson keep their fees in her trust account.[33]

Instead, Respondent used her business account as her primary bank account. On May 25, 2011, just after her first meeting with Peters and Henderson, the business account balance was $284.02.[34] Respondent deposited the $2,100.00 they had paid her on May 27, 2011, which raised the account balance to $2,384.02.[35] Six days later, an automatic debit of $1,653.31 for her home mortgage and a $400.00 check to the U.S. Treasury reduced the balance to $330.71.[36] Respondent had not earned the legal fees consumed by these payments.

After Respondent deposited Peters and Henderson's $350.00 installment on June 29, 2011, the account balance was $168.60.[37] According to Respondent's own accounting, she had performed no more than two-and-a-half hours of work on Peters's case by this date.[38]

For most of July 2011, the account had a negative balance, and Respondent was charged several hundred dollars in overdraft and insufficient funds fees.[39] The next month, the account was operating in the black, with an average ledger of $1,273.00.[40] When Peters and Henderson paid Respondent $300.00 on August 1, 2011, Respondent's account had a balance of $751.27.[41] For the remaining months of 2011, the account had average ledgers of $1,521.00, $944.00, $1,062.00, and $2,524.00, respectively, al-

though the account carried a negative balance for a few days in November.[42]

After June 2011, Respondent ceased making automatic mortgage payments at the start of each month.[43] Although she began discussing loan modification with her bank sometime that year, the bank filed foreclosure proceedings against her in late 2011. Those proceedings were dismissed the following summer.

Respondent testified that in addition to the three accounts discussed above, she had a retirement account with about $21,000.00. She said she could have used money from that account to refund her clients, if needed, though to do so she would have had to withdraw a minimum of $5,000.00.

According to Respondent, she failed to monitor her bank account during her representation of Peters and Henderson because of family-related problems. During that period, her eighty-year-old mother in Chicago had to be hospitalized after becoming emaciated and ill; in addition, a so-called handyman had moved into her mother's house against her mother's will and refused to leave. In light of these problems, Respondent moved her mother to Colorado, which required significant time and resources. In addition, Respondent's teenage daughter was experiencing serious behavioral and emotional difficulties, such as running away from home and lashing out at teachers and Respondent.

---

**32.** Ex. 27 at 247–55.

**33.** The People sought to admit Respondent's trust account records to show that she also failed to place other clients' fees in that account. Respondent objected under CRE 404(b), arguing that the People were improperly seeking to demonstrate that she had acted in conformity with a character trait. The PDJ ruled in Respondent's favor, finding it unnecessary to review the trust records, given that the People had not charged Respondent with misconduct relating to other clients and Respondent had already admitted she did not place Peters and Henderson's funds in her trust account. The PDJ overruled Respondent's objection to admitting her personal account records, however, finding them relevant to her state of mind.

**34.** Ex. 27 at 259.

**35.** Ex. 27 at 259.

**36.** Ex. 27 at 264–66.

**37.** Ex. 27 at 266.

**38.** Stip. Ex. 1.

**39.** Ex. 27 at 271–72.

**40.** Ex. 27 at 274.

**41.** Ex. 27 at 276.

**42.** Ex. 27 at 279–96.

**43.** Ex. 27 at 271–96.

### Termination of Representation and Refund of Fees

At the disciplinary hearing, Henderson testified he was upset both that Respondent had sent him and Peters "demand letters" reminding them of their upcoming payments and that she had asked about the status of his annulment, since he had not hired her to work on that case. Both parties agree that the attorney-client relationship broke down on November 15, 2011, when Respondent and Henderson spoke by phone. In that conversation, Henderson told Respondent he did not trust lawyers, and Respondent suggested that she withdraw from the representation if he did not trust her.

Later that same day, Peters emailed Respondent to officially terminate the representation.[44] Peters asserted that Respondent was entitled to a legal fee for only one hour of work, reflecting Respondent's appearance at the hearing on May 31, 2011.[45] Peters asked that Respondent inform them of her hourly charge and refund the remaining portion of their flat fee within three days.[46] The bottom of the email bore a "confidentiality footer," indicating that legal advice in the message was "solely for the benefit of the Moore, Schulman & Moore, APC client(s)." [47]

Respondent wrote to Peters on November 19, 2011, saying she was moving to withdraw from the case and would review the file to calculate the refund due after her motion was granted.[48] Peters emailed Respondent on December 7, 2011, saying she and Henderson would take action against Respondent if she did not return their money within two days; in reply, Respondent reiterated that she would determine the amount of refund owed after the immigration judge granted her motion to withdraw.[49] Henderson responded in a voicemail, threatening to file grand larceny charges. Peters and her mother also visited Respondent's office, accompanied by Westminster police officers, in an effort to reclaim Peters and Henderson's legal fees, but Respondent was not there at the time.

On the day after Christmas, Peters forwarded to Respondent a copy of the immigration judge's order granting her motion to withdraw, again asking for a refund of attorney's fees.[50] Four days later, on December 30, 2011, Respondent sent Peters and Henderson money orders, along with a letter explaining the refund:

> Enclosed please find a refund in the amount of $1,835.86 which represents the unearned portion of my legal fee and costs. I spent 4.41 hours, billed at an hourly rate of $250. From the $2,950 you paid, I am deducting $1,102.50 for my attorney time on your case consisting of research, correspondence, motion to withdraw, travel time, court appearance and $11.64 for postage and photocopying charges for a total of $1,114.14.
>
> I wish you the best in your immigration court case.[51]

On January 1, 2012, Peters emailed Respondent, disputing her decision to keep $1,114.14 in fees and requesting a detailed accounting.[52] Respondent did not respond. She testified that she believed she had already provided the required accounting and that she was still "reeling" from Henderson's threatening voicemail and therefore felt it best to minimize contact with her former clients.

Peters and Henderson then filed a request for investigation with the People. On March 19, 2012, Respondent sent the People a handwritten log titled "Description of Work Per-

---

**44.** Stip. Ex. 15.

**45.** Stip. Ex. 15.

**46.** Stip. Ex. 15.

**47.** Stip. Ex. 15. This firm appears to be based in San Diego, California. Henderson and Peters did not explain the presence of this footer, but they testified that they had not in fact consulted with other counsel regarding this fee dispute.

**48.** Stip. Ex. 16.

**49.** Stip. Ex. 17.

**50.** The immigration court mailed the notice on December 19, 2011. Respondent testified that she was out of the office in the days leading up to Christmas, so she first saw the notice when Peters forwarded it.

**51.** Stip. Exs. 19–20.

**52.** Stip. Facts ¶¶ 28–29.

formed," asserting that she had expended 5.166 hours in representing Peters and Henderson and listing her legal services, the dates of those services, and the amount of time she spent performing those services.[53] The log indicates that Respondent spent ninety minutes at the master calendar hearing (sixty minutes of travel time and thirty minutes of court time), forty minutes on legal research in June 2011, fifteen minutes preparing for the meeting scheduled for August 20, 2011, and about thirty increments of five minutes each on letters, emails, and calls to Peters and Henderson.[54] The total time reflected in the log is 5.166 hours, but Respondent only had billed her clients for 4.41 hours.[55] On February 11, 2013, Respondent sent Peters and Henderson a check for $1,114.14—representing a full refund of her flat fee.[56]

### Colo. RPC 1.15(a), 1.15(c), and 1.5(f)

■ Respondent admits to two of the People's claims: violation of Colo. RPC 1.15(a) and 1.15(c). Colo. RPC 1.15(a) requires a lawyer to hold client property in a trust account, separate from the lawyer's own property. Respondent failed to keep Peters and Henderson's unearned fees in a trust account and negligently converted their funds in contravention of Colo. RPC 1.15(a).[57] Similarly, Colo. RPC 1.15(c) mandates that a lawyer keep property in which two or more persons claim an interest separate from the lawyer's own property until there is an accounting and severance of the interests. Respondent placed Peters and Henderson's funds in her own business account without providing any accounting to them. She thereby violated Colo. RPC 1.15(c).

■ Respondent did not directly admit at the disciplinary hearing that she violated Colo. RPC 1.5(f), but we find she did so. Colo. RPC 1.5(f) states that a lawyer does not earn fees "until the lawyer confers a benefit on the client or performs a legal service for the client"; it also notes that advances of unearned fees belong to the client and must be deposited in the lawyer's trust account until earned. Respondent admitted that she immediately placed Peters and Henderson's fees into her business account, not her trust account. The evidence also makes clear that she had not earned all of the fees upon receipt, when she deposited them in her business account and began using them for her own purposes. As such, the Hearing Board concludes that Respondent violated Colo. RPC 1.5(f).

The People's remaining three claims— Colo. RPC 1.15(b), 1.16(d), and 8.4(c)—require more in-depth analyses. We begin with Colo. RPC 1.15(b).

### Colo. RPC 1.15(b)

■ Colo. RPC 1.15(b) requires lawyers to "promptly," upon a client's request, "render a full accounting" regarding funds in which the client has an interest. The People allege Respondent violated this rule because she provided an inadequate accounting to Peters and Henderson on December 30, 2011, and because she did not respond to Peters's subsequent request for a detailed accounting.

Neither Colo. RPC 1.15(b) nor the comments to the rule elucidate the phrase "full accounting." Colorado case law makes clear that a lawyer violates Colo. RPC 1.15(b) by failing outright to provide any form of accounting to a client upon request, or by accounting for only a portion of a client's funds.[58] However, there is little guidance

---

**53.** A typed version of that log appears as stipulated exhibit 1.

**54.** Stip. Ex. 1

**55.** This discrepancy is not fully explained.

**56.** Stip. Ex. 22.

**57.** A lawyer does not earn advance fees upon receipt; rather, "an attorney earns fees only by conferring a benefit on or performing a legal

service for the client." *In re Sather,* 3 P.3d 403, 410 (Colo.2000); *see also* Colo. RPC 1.5(f).

**58.** *See, e.g., In re Stevenson,* 979 P.2d 1043, 1044 (Colo.1999) (holding that lawyer violated Colo. RPC 1.15(b) by entirely failing to render an accounting); *People v. Fager,* 925 P.2d 280, 282 (Colo.1996) (finding that lawyer violated Colo. RPC 1.15(b) when he did not account for the full balance of client funds). Along similar lines, an accounting for only a limited span of the representation is not a "full accounting." *See In re Disciplinary Proceedings against Brown,* 329

about minimum standards for a full accounting in Colorado and in other jurisdictions with analogous rules.[59]

The Hearing Board concludes that the letter Respondent sent Peters and Henderson on December 30, 2011, satisfied Colo. RPC 1.15(b). The letter identified (1) Respondent's hourly rate, (2) the number of hours she worked on the case, (3) the five activities she spent her time on, and (4) her postage and photocopying charges. No time period was omitted, and no portion of the flat fee was left unexplained. It would have been better practice for Respondent to have included more details about when she earned fees and the type of legal research she performed, as she later did in her "Description of Work Performed" ("Immigration Marriage Fraud research" and "Research/bona fide marriage proof").[60] But we cannot hold Respondent to those ideals in light of the lack of specificity in the legal authorities and the clear and convincing standard of evidence in this proceeding.

■ We also find that Respondent rendered her accounting "promptly" within the meaning of Colo. RPC 1.15(b). The immigration court mailed the order granting Respondent's motion to withdraw on December 19, 2011, and eleven days later—just four days after she received a copy of the order from Peters—Respondent sent her clients the accounting. We believe she acted within a reasonable timeframe, particularly in light of the intervening holiday.

■ Finally, the People suggest that Peters's request for a detailed accounting on January 1, 2012, triggered an obligation for Respondent to provide a more extensive accounting than that which she had already provided. We disagree. To accept the People's argument would effectively transform clients into the arbiters of legally satisfactory accountings under Colo. RPC 1.15(b). If a lawyer has provided an accounting that meets the applicable legal standards—as we find Respondent did here—a client cannot effectively impose stricter professional obligations upon the lawyer simply by asking for additional detail.

## Colo. RPC 1.16(d)

■ Colo. RPC 1.16(d) provides that, "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interest," including "refunding any advance payment of fee or expense that has not been earned or incurred." The People assert Respondent should have refunded Peters and Henderson's entire legal fee in November 2011, upon her discharge.

As an initial matter, the Hearing Board disagrees with the People's position that any refund was due immediately upon Respondent's receipt of Peters's email discharging her. It is not "reasonably practicable" for a lawyer to refund unearned fees when a court might deny the lawyer's motion to withdraw and instead order the lawyer to complete the full scope of legal services initially agreed upon. Until a court grants a lawyer's motion to withdraw, the lawyer remains as counsel for the client, and the representation has not officially ended.[61] Courts generally do not take long to rule on motions to withdraw, so a lawyer will not unreasonably delay a

---

Wis.2d 21, 787 N.W.2d 800, 805–06 (2010) (holding that lawyer violated analogue to Colo. RPC 1.15(b) by providing billing statements covering only a portion of the representation).

59. David R. Yates, Commentary, *Accounting of Funds: What Do Lawyers Owe Their Clients?*, 25 J. Legal Prof. 255, 260–61 (2001) (stating that "a lawyer has almost complete discretion, under Rule 1.15, as to the amount of detail the accounting ... will provide" and that "[m]ost states simply do not give any guidance as to the amount of detail required by their equivalent to Rule 1.15").

60. Stip. Ex. 1.

61. *See* Colo. RPC 1.16(c) ("When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation."); 8 C.F.R. § 1003.17(b) (providing that a lawyer may not withdraw from an immigration court case until a judge grants the lawyer's motion to withdraw); U.S. Department of Justice Executive Office for Immigration Review, *Immigration Court Practice Manual* § 2.3(*i*)(ii)-(iii) (2013) (indicating that a lawyer who wishes to withdraw remains counsel of record until the court grants a motion to withdraw, and that a lawyer who has been discharged by the client remains attorney of record until the court grants a motion for substitution of counsel or a motion to withdraw).

client's receipt of unearned fees by waiting to forward those funds until the lawyer has received permission to withdraw. We find Respondent timely refunded her unearned fees.[62]

■ The more difficult question presented here is whether Respondent properly retained the $1,114.14 she believes she earned in legal fees and costs until February 11, 2013, when she ultimately refunded that sum to Peters and Henderson. In the People's view, Respondent's failure to include in her fee agreement benchmarks or milestones indicating when she would earn her legal fees precluded her from keeping any fees, because she did not complete the three tasks she had pledged to perform. In support, the People look to comment 11 to Colo. RPC 1.5, the rule governing fees and fee agreements:

> To make a determination of when an advance fee is earned, the written statement of the basis or rate of the fee, when required by Rule 1.5(b),[63] should include a description of the benefit or service that justifies the lawyer's earning the fee, the amount of the advance unearned fee, as well as a statement describing when the fee is earned. Whether a lawyer has conferred a sufficient benefit to earn a portion of the advance fee will depend on the circumstances of the particular case. The circumstances under which a fee is earned should be evaluated under an objective standard of reasonableness.

This comment provides sensible guidance, but it does not explicate Colo. RPC 1.16(d)

itself, after all, and it uses the non-mandatory term "should" rather than "shall" or "must." Moreover, the Colorado Supreme Court suggested in *In re Sather* that it is appropriate for a lawyer to draw upon an advance fee using either milestones *or* hours worked to measure the fee earned.[64]

■ Respondent insists that she was entitled to recover on a quantum meruit basis for representing Peters in immigration court—one of the three tasks outlined in her fee agreement—and that she therefore did not violate Colo. RPC 1.16(d) by keeping a portion of her fee. Quantum meruit, also known as unjust enrichment, is an equitable theory that permits a party to recover the reasonable value of services provided if the parties either do not have a contract or if that contract has been abrogated.[65] "To recover in quantum meruit, a plaintiff must demonstrate that (1) at plaintiff's expense, (2) defendant received a benefit, (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying."[66] To determine whether retention of the benefit is unjust, courts examine the parties' intentions, expectations, and behavior.[67] Application of this doctrine "does not depend upon the existence of a contract."[68]

In the context of flat fee agreements, the Colorado Supreme Court has recognized time and again that "[u]pon discharge, ... [an] attorney may be entitled to quantum meruit recovery for the services that the attorney rendered and for costs incurred on behalf of the client."[69] Jurisdictions across the coun-

---

**62.** By contrast, in *In re Sather*, 3 P.3d at 415, the Colorado Supreme Court held that a lawyer violated Colo. RPC 1.16(d) by only partially repaying the client's retainer three months after his discharge and paying the remainder five months after his discharge, while in *People v. Sigley*, 917 P.2d 1253, 1254 (Colo.1996), a lawyer violated Colo. RPC 1.16(d) by waiting more than seven months after his discharge to return unearned funds.

**63.** Respondent was required by Colo. RPC 1.5(b) to provide a written fee agreement in this case because she had not previously represented Peters and Henderson.

**64.** 3 P.3d at 411 ("Often, attorneys collect a certain amount from the client in advance of any work and deduct from that amount according to

the hours worked or mutually agreed-upon 'milestones' reached during representation.").

**65.** *Melat, Pressman & Higbie v. Hannon Law Firm*, 287 P.3d 842, 847 (Colo.2012).

**66.** *Id.*

**67.** *Id.*

**68.** *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444 (Colo.2000).

**69.** *In re Sather*, 3 P.3d at 409–10; *see also Melat*, 287 P.3d at 847; *Mullens v. Hansel–Henderson*, 65 P.3d 992, 999 (Colo.2002); *Dudding*, 11 P.3d at 445; *Olsen & Brown v. City of Englewood*, 889 P.2d 673, 675 (Colo.1995). Under contingency

try likewise have recognized that lawyers may recover the reasonable value of services they performed under a flat fee agreement if they are discharged, without fault on their part, before completing the representation.[70]

In *People v. Johnson*, a case involving the precursor to Colo. RPC 1.16(d), the Colorado Supreme Court applied the principle of quantum meruit to determine the share of an advance fee a lawyer was entitled to retain upon termination of representation.[71] In that case, a lawyer received a retainer of $1,500.00 in a criminal defense matter, but he did not specifically agree with his client as to the fees he could retain if the client prematurely terminated his services.[72] According to the Colorado Supreme Court, the lawyer's fee arrangement therefore "by necessity was upon a quantum meruit basis."[73] After just ten days, the client discharged the lawyer, and the lawyer did not refund any of the advance fee.[74] Since the evidence showed the lawyer had spent about eight or nine hours on the case and had incurred about $50.00 in expenses, the Colorado Supreme Court ruled that the lawyer was "entitled on a quantum meruit basis" to $500.00 but was obligated to refund the remaining portion of the retainer.[75]

We now examine whether the three required elements for quantum meruit recovery are present here.[76] The first re-

quirement is easily met, as Respondent unquestionably provided legal services at her own expense. Second, Peters faced removal if her master calendar hearing were not continued, a risk that was diminished by Respondent's preparation, presence, and relationship with the judge. Respondent also provided legal advice about Peters's case. As such, the evidence shows that Peters received a benefit from Respondent.

Third, we consider the parties' intentions, expectations, and behavior to determine whether it would be unjust for Peters to retain the benefit of legal services without paying. Despite Peters's and Henderson's testimony to the contrary, they clearly understood—and in fact expected—that Respondent would immediately begin work on Peters's case, including by attending the master calendar hearing on May 31, 2011. Indeed, in her email of November 15, 2011, Peters acknowledged that Respondent was entitled to a legal fee for appearing at the hearing, although Peters assumed that Respondent spent just an hour there.[77] While Peters and Henderson may not have realized that Respondent had performed some legal research on the case, it was entirely reasonable for Respondent to have done so and to have billed her clients for the various five-minute increments of time she spent commu-

---

fee agreements, by contrast, a Colorado lawyer is not entitled to recover fees in quantum meruit when the agreed-upon services are not completed and the fee agreement does not notify the client of the possibility of such recovery. *Mullens*, 65 P.3d at 995–97 (observing that C.R.C.P. Ch. 23.3 Rule 5 requires contingency fee agreements to include "a statement of the contingency upon which the client is liable to pay compensation otherwise than from amounts collected for him by the attorney" and that clients in contingency fee agreements do not normally expect to pay any legal fees before full completion of legal services).

70. 7 Am.Jur.2d Attorneys at Law § 280; *see also* Restatement (Third) of Law Governing Lawyers § 39 (2000) (stating that a lawyer is entitled to recover a fair fee in quantum meruit for legal services provided to a client when the parties have abrogated their fee agreement); *Somuah v. Flachs*, 352 Md. 241, 721 A.2d 680, 688 (1998) ("the trend in other jurisdictions is generally to permit an attorney discharged by a dissatisfied client to recover compensation in quantum me-

ruit from the client for services rendered prior to discharge").

71. 199 Colo. 248, 250–51, 612 P.2d 1097, 1099 (1980) (ruling that lawyer violated DR–2–110(A)(3), which required a prompt refund of unearned fees upon withdrawal from representation).

72. *Id.* at 249, 612 P.2d at 1098.

73. *Id.*

74. *Id.* at 249, 612 P.2d at 1098–99.

75. *Id.* at 250, 612 P.2d at 1099. For purposes of calculating this sum, the Colorado Supreme Court accepted the lawyer's testimony that his hourly fee was $50.00. *Id.* at 250, 612 P.2d at 1098–99.

76. *See Melat*, 287 P.3d at 847.

77. Stip. Ex. 15.

nicating with them.[78] In light of these circumstances, we find it would be unjust for Peters to benefit from Respondent's legal services without paying.

We must also consider whether Respondent's misconduct bars recovery in quantum meruit here. The Colorado Supreme Court has indicated that a lawyer may forfeit his or her right to recover in quantum meruit if the lawyer abandons the client's case or engages in other serious misconduct.[79] The Restatement of Law Governing Lawyers identifies the following standards for forfeiture:

A lawyer engaging in [a] clear and serious violation of [a] duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter. Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies.[80]

Forfeiture has been deemed appropriate in cases where a lawyer represented a client despite a conflict of interest, where a lawyer coerced a client, and where a lawyer practiced law in a state where not admitted.[81] But the Restatement indicates that a lawyer who fails to keep a client's funds segregated, yet ultimately preserves the client's funds, should not be forced to forfeit fees.[82]

The Hearing Board finds that Respondent's misconduct here did not bar her from retaining some fees in quantum meruit.[83] As discussed in the next section, we do not find that Respondent engaged in knowing conversion. And although she violated Colo. RPC 1.15(a), 1.15(c), and 1.5(f), her misconduct was not willful, it did not vitiate the value of her legal services, and her clients were made whole. In keeping with the Restatement's approach and relevant case law, we find she did not forfeit her right to recover in quantum meruit. Accordingly, Respondent did not violate Colo. RPC 1.16(d); by retaining the portion of her fee she believed she had earned under her standard hourly fee, she was acting in accordance with the prevailing legal authorities.

### Colo. RPC 8.4(c)

The People's final claim is that Respondent engaged in knowing conversion

78. We note that Respondent's letters to her clients not only notified them of their upcoming payments but also inquired about the status of the annulment matter, on which Peters's immigration case depended. Further, it was not unreasonable for Respondent to remind them of upcoming payments, given that their June and July payments were late. We also observe that Respondent did not charge her clients for all of her legal services, such as explaining the status of Peters's case in the fee agreement and preparing for the master calendar hearing.

79. *Dudding*, 11 P.3d at 448 (citing *Somuah*, 721 A.2d at 688 (stating that a lawyer who has engaged in serious misconduct may not be entitled to recover a fee); *Int'l Materials Corp. v. Sun Corp.*, 824 S.W.2d 890, 894 (Mo.1992) (finding that a lawyer who abandons a contract is not entitled to recover in quantum meruit); *White v. McBride*, 937 S.W.2d 796, 803 (Tenn.1996) (holding that a lawyer who charges a grossly excessive fee cannot recover in quantum meruit, since such misconduct is "an ethical transgression of a most flagrant sort" and recovery "would encourage attorneys to enter exorbitant fee contracts, secure that the safety net of quantum meruit is there in case of a subsequent fall")).

80. Restatement (Third) of Law Governing Lawyers § 37 (2000).

81. *Id.* (citing, *inter alia*, *Crawford & Lewis v. Boatmen's Trust Co.*, 338 Ark. 679, 1 S.W.3d 417 (1999); *Jackson v. Griffith*, 421 So.2d 677 (Fla. App.1982); *Ranta v. McCarney*, 391 N.W.2d 161 (N.D.1986)).

82. *Id.*

83. Some courts have only allowed a lawyer to recover in quantum meruit if the lawyer was discharged without cause. *See Dudding*, 11 P.3d at 448. Here, Peters and Henderson did not discharge Respondent because she was commingling their funds or for any other fault on her part. Instead, it appears they discharged her because she inquired about Henderson's annulment case, sent what he characterized—unreasonably, in our view—as "demand letters," and engaged in a somewhat heated discussion with Henderson. Peters also said she was unhappy that Respondent was "holding her hostage" by refusing to perform work without full payment of her fee, but we do not find her testimony credible in light of the evidence that Respondent in fact attended the master calendar hearing and scheduled the August meeting with her clients, among other work, without having received the full fee.

when she deposited her clients' unearned fees into her business account and then used the fees for personal expenses without her clients' authorization. Through these actions, the People allege Respondent violated Colo. RPC 8.4(c), which proscribes conduct involving dishonesty, fraud, deceit, or misrepresentation.

To succeed on their claim, the People need not show that Respondent meant to permanently deprive her clients of their funds.[84] Instead, they must only demonstrate that Respondent knowingly took her clients' funds without authorization.[85] To illustrate, "using client funds for personal use without the client's permission by writing a check on a trust account that the lawyer knows contains only client funds would be a knowing conversion of client funds, whether or not the lawyer intended to eventually replace the funds."[86] By contrast, "depositing client funds into a trust account with a negative balance, if done only negligently, would be a technical rather than knowing conversion of client funds."[87]

The People contend Respondent knowingly converted Peters and Henderson's funds because she immediately deposited their fees into her business account and used them for personal expenses on successive occasions. Respondent, on the other hand, maintains that she acted negligently; she was distracted by her mother's failing health and her daughter's behavioral problems and was not minding her bank accounts.

 We must determine whether Respondent knowingly placed unearned funds into her business account without authorization and whether she knowingly used those funds for her own purposes. The evidence shows she did knowingly place unearned fees into her business account without authoriza-

tion.[88] Even though she testified that she did not realize the fees belonged in her trust account, lawyers are presumed to know the Rules of Professional Conduct.[89] The more difficult inquiry is whether Respondent knew she was using Peters and Henderson's funds for her own purposes. To answer this question, we examine Respondent's bank records.

As detailed above, Respondent's business account balance was $284.02 on May 25, 2011, just after her first meeting with Peters and Henderson.[90] When she deposited their $2,100.00 payment two days later, the balance reached $2,384.02.[91] Six days later, an automatic debit of $1,653.31 for her home mortgage and a $400.00 check to the U.S. Treasury reduced the balance to $330.71.[92] This resulted in at least a technical conversion of client funds, since Respondent had earned only a small portion of her flat fee. Throughout the month of June, Respondent made several deposits while also incurring debits for insurance and telephone bills, among other expenses. Since Respondent's accounting reflects that she had earned just $625.00 by the end of June, yet her account balance was only $168.60 on June 29, 2011, Respondent effectively consumed her clients' funds throughout that month.

There were no automatic debits for Respondent's home mortgage in July or the remainder of 2011. In July, Respondent's account was in overdraft for most of the month, and she was charged several hundred dollars in overdraft and insufficient funds fees. During that month, she effectively continued to use unearned fees belonging to Peters and Henderson, since she only performed fifteen additional minutes of work on their behalf in July.

In August, Respondent's account had an average ledger of $1,273.00. After Peters

84. *People v. Varallo,* 913 P.2d 1, 10 (Colo.1996).

85. *Id.* at 11.

86. *Id.*

87. *Id.*

88. *See In re Sather,* 3 P.3d at 410–11 ("an attorney earns fees only by conferring a benefit on or performing a legal service for the client").

89. *In re Fisher,* 202 P.3d 1186, 1198 (Colo.2009) ("All Colorado attorneys are presumed to be aware of the Rules of Professional Conduct and their impact.").

90. Ex. 27 at 259.

91. Ex. 27 at 259.

92. Ex. 27 at 264–66.

and Henderson paid her $300.00 on August 1, 2011, the account balance was $751.27. For some portions of the month, the account balance exceeded the unearned portion of Peters and Henderson's fee, while on other dates, the balance was lower than that figure. In September, October, November, and December 2011, the account's average ledgers were $1,521.00, $944.00, $1,062.00, and $2,524.00, respectively, and the account's balance was negative for just a few days in November. As in August, the balance on some occasions exceeded and on other occasions did not exceed the unearned portion of Peters and Henderson's fee.

Applying the exacting burden of proof here, the Hearing Board does not find that Respondent knowingly consumed her clients' funds in violation of Colo. RPC 8.4(c). Respondent's mortgage payment on June 2, 2011, for instance, was merely an automatic debit. Furthermore, the bank records indicate that Respondent effectively did not monitor or manage her account between May and December 2011. The substantial charges for overdrafts and insufficient funds she incurred strongly suggest her attention was elsewhere. More important, Respondent provided credible testimony that she was preoccupied with family-related concerns during the period at issue and that she does not have an aptitude for business and financial matters. Respondent's testimony regarding her family's circumstances was corroborated by Laurel Herndon, a lawyer who operates a nonprofit immigration organization in Boulder County.

In sum, the testimony and evidence in this matter do not convince us that Respondent realized she was consuming client funds. In fact, aside from Respondent's inappropriate handling of client funds (which we by no means wish to trivialize), we believe her dealings with Peters and Henderson consistently reflected professionalism, loyalty, and respect. We find the People have not proved a

violation of Colo. RPC 8.4(c) by clear and convincing evidence.

## IV. SANCTIONS

■ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[93] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* By violating Colo. RPC 1.15(a), 1.15(c), and 1.5(f), Respondent violated a duty to her clients to safeguard their property.[94]

*Mental State:* Respondent's state of mind cannot be characterized as negligent, because she did more than fail to "heed a substantial risk that circumstances exist or that a result will follow," to borrow from the ABA *Standards'* definition of negligence.[95] She bears a greater degree of responsibility for her misconduct than a merely negligent lawyer would, because she did not heed her professional obligations to familiarize herself with and scrupulously follow the Rules of Professional Conduct. At the same time, we do not believe that she was fully conscious of her conduct or that she was aware she was shirking her ethical duties. We thus find Respondent should have known she was improperly handling her clients' funds.

■ *Injury:* There is no evidence that Respondent's misconduct caused her clients actual harm. But a lawyer causes a client possible injury by commingling client funds

93. *See In re Roose*, 69 P.3d 43, 46–47 (Colo. 2003).

94. *See* ABA *Standard* 4.0. Although Appendix 1 to the ABA *Standards* suggests that violations of Colo. RPC 1.5 represent a breach of a duty owed as a professional under ABA *Standard* 7.0, we find Respondent's misconduct here—which in-

volves the same actions that underlie her violations of Colo. RPC 1.15(a) and 1.15(c)—is more properly considered as a breach of her duty to her clients under ABA *Standard* 4.0.

95. ABA *Standards* § III at 9.

with the lawyer's own funds; to do so creates a risk that the lawyer's creditors will gain access to the client's funds or that the lawyer will misuse the funds.[96]

### ABA *Standards* 4.0–7.0—Presumptive Sanction

ABA *Standard* 4.12 provides that suspension is generally warranted when a lawyer knows or should know he or she is dealing improperly with client property, thereby causing injury or potential injury to the client. ABA *Standard* 4.12 is commonly applied to "lawyers who commingle client funds with their own." [97] Public censure, by contrast, is called for where lawyers are merely negligent in mishandling client property, such as by failing to follow their own established procedures or neglecting to train office staff to properly handle client funds.[98]

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating circumstances are any considerations that may justify an increase in the degree of the presumptive sanction to be imposed, while mitigating circumstances may justify a reduction in the severity of the sanction.[99] The Hearing Board considers below evidence of the aggravating and mitigating factors the parties have asked us to apply in this case.

*Dishonest or Selfish Motive—9.22(b):* The People argue that Respondent was experiencing financial difficulties at the time of her misconduct, and that she took money from her clients to alleviate those pressures. But we find that Respondent's conduct did not reflect an attempt to benefit herself at her clients' expense, and we therefore do not weigh this factor in aggravation.

*Pattern of Misconduct—9.22(c):* The evidence does not establish that Respondent engaged in a pattern of misconduct here. Although she improperly handled Peters and Henderson's funds for several months, this was a sustained instance of mishandling client funds in one representation, rather than a series of repeated events involving multiple clients.[100]

*Multiple Offenses—9.22(d):* Likewise, we do not find that Respondent engaged in multiple offenses here, since her three rule violations all arise out of the same conduct.[101]

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* The People suggest we should consider this factor in aggravation, but we do not find it applicable. Respondent admits she violated Colo. RPC 1.15(a) and 1.15(c). She also testified that she realizes she did not fully understand the Rules of Professional Conduct at the time of her misconduct, she has attended the trust account school sponsored by the People to learn those rules, and she has hired a bookkeeper.

*Vulnerability of Victim—9.22(h):* The People argue that because Peters was facing removal from the United States, she and Henderson are vulnerable victims. We do not view them as such. To the contrary, they appear to be savvy consumers of legal services. Peters, who speaks English fluently, has succeeded in staying in the United States since obtaining her visitor's visa in 2000. Moreover, the couple was resourceful, for instance by seeking the assistance of the Westminster police department and by using a law firm's confidentiality footer in an email to Respondent, thereby signaling that they could pursue legal remedies against her.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was admitted to the bar in 1995 and thus qualifies as an experienced practitioner. Therefore, we apply this factor in aggravation.

---

**96.** *See In re Sather,* 3 P.3d at 409; *People v. Shidler,* 901 P.2d 477, 479 (Colo.1995).

**97.** ABA *Standard* 4.12, commentary.

**98.** *Id.*

**99.** *See* ABA *Standards* 9.21 & 9.31.

**100.** *See In re Roose,* 69 P.3d at 49 (according no weight to the aggravating factors of a pattern of misconduct or multiple offenses where an attorney's misconduct "actually involved only two separate acts, arising from the same lack of understanding, and the same misguided perception of zealous advocacy, in the same case").

**101.** *See id.*

*Absence of Prior Disciplinary Record— 9.32(a):* We consider in mitigation that Respondent has not previously been disciplined during her lengthy practice.

*Absence of Dishonest or Selfish Motive— 9.32(b):* As noted above, we do not find that Respondent acted with dishonest or selfish motives. Nevertheless, we will not consider a lack of such motives as a mitigating factor, because we believe Respondent acted without adequate consideration of the risks her financial mismanagement posed to her clients.

*Personal or Emotional Problems—9.32(c):* Respondent and Laurel Herndon testified that Respondent was experiencing difficult personal problems involving her mother's declining health and her teenage daughter's behavioral issues at the time of her misconduct. We believe the emotional strain produced by these circumstances contributed to Respondent's neglect of her professional duties, and we accord substantial weight in mitigation to this factor.

*Timely Effort to Make Restitution— 9.32(d):* Respondent sent Peters and Henderson a check for $1,114.14—the remaining disputed portion of her flat fee—on February 11, 2013. This payment is a mitigating factor.[102]

*Cooperative Attitude Toward Proceedings—9.32(e):* Respondent testified that she believed she cooperated with the People in this matter. The People do not assert Respondent was uncooperative, nor have we seen any such evidence. As such, we apply this factor in mitigation.

*Character or Reputation—9.32(g):* Laurel Herndon offered persuasive testimony that Respondent has an excellent reputation within the immigration law bar. Herndon characterized Respondent as one of the most honest people she has ever known, saying she tries to model her own approach to the law after Respondent's.

Respondent also testified to her substantial record of volunteer work. She has provided pro bono services to children in foster care, volunteered at nonprofit citizenship drives, served on a pro bono immigration court committee that seeks to support unrepresented people, assisted a coalition attempting to launch a free immigration clinic in Denver, and volunteered her services to teenage mothers through Hope House of Colorado. She also took on ten to fifteen pro bono clients who otherwise would have lost representation when the University of Colorado Law School closed the immigration clinic she worked for. We consider Respondent's commitment to assisting an underserved community as additional evidence of her good character.

*Remorse—9.32(l):* Respondent testified that she regrets her misconduct and the deterioration of her relationship with Peters and Henderson, since she usually gets along well with clients. Her comments, however, indicated that she feels she let herself down, not that she feels remorse for the potential harm her misconduct caused her clients or the blemish it placed upon the profession's reputation. As such, we will apply this factor but give it relatively little weight.

### Analysis Under ABA *Standards* and Colorado Case Law

We are aware of the Colorado Supreme Court's directive to exercise our discretion in selecting a sanction by carefully applying the aggravating and mitigating factors.[103] We also acknowledge that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[104] Although prior cases are helpful by way of analogy, appropriate sanctions for a lawyer's misconduct are determined on a case-by-case basis.

---

**102.** See *In re Fischer,* 89 P.3d 817, 821 (Colo. 2004) (ruling it the "better policy to allow a good faith effort to make restitution to be considered in mitigation in order both to encourage lawyers to reduce the injuries they have caused and help insure recognition of the wrongfulness of their conduct").

**103.** *In re Attorney F.,* 285 P.3d 322, 327 (Colo. 2012); *see also In re Fischer,* 89 P.3d at 822 (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

**104.** *In re Rosen,* 198 P.3d at 121.

In some prior disciplinary cases involving negligent conversion coupled with other misconduct, the Colorado Supreme Court has imposed lengthy suspensions. For instance, in *People v. McGrath*, a lawyer who used client funds for his own purposes and who also neglected a client matter and made a false statement to investigatory authorities was suspended for a year and a day.[105] In *People v. Wechsler*, a lawyer was suspended for a year and a day when he failed to place client funds in a trust account, made misrepresentations regarding the location of the funds, and failed to provide an accounting to a client for nearly a two-year period, among other misconduct, where three mitigating factors and two aggravating factors were present.[106]

█ Public censure is generally reserved for lawyers who mishandle client funds without actually converting those funds. For instance, in *People v. Woodrum*, the Colorado Supreme Court publicly censured a lawyer who commingled client funds with her own, among other rule violations, but who was not charged with converting the client funds to her own use.[107]

In this case, Respondent's misconduct posed a significant risk to her clients, and we believe a suspension is warranted. However, this case is readily distinguishable from those discussed above, where lengthy suspensions were imposed for the mishandling of client funds coupled with other misconduct. Here, Respondent's misconduct did not extend to other types of wrongdoing, and the mitigating factors greatly outweigh the sole aggravating factor.

We conclude a suspension for three months, all stayed upon the successful completion of a six-month period of probation,

with conditions, is the appropriate sanction. Probation is fitting here because we find Respondent is unlikely to harm the public and she is both able and eager to conform her practice to professional standards.[108] Although we are encouraged by Respondent's testimony that she has hired a bookkeeper and attended the trust account school sponsored by the People, we believe she would benefit from structured guidance concerning trust account management and other aspects of overseeing her firm's finances. In our assessment, Respondent lacks a grounding in business management skills but is strongly motivated to serve her clients and the profession with distinction. We therefore order her to work with an accounting mentor during her period of probation.

## V. CONCLUSION

Respondent commingled her clients' legal fees with her own funds in her business account and withdrew those funds for her personal use. In light of the multiple mitigating factors here, the appropriate sanction is a three-month suspension, all stayed upon the successful completion of a six-month period of probation.

## VI. ORDER

The Hearing Board therefore **ORDERS:**

1. **Juliet Carol Gilbert**, attorney registration number 25640, is **SUSPENDED FOR THREE MONTHS, all STAYED** upon the successful completion of a six-month period of probation, with conditions. The **PROBATION SHALL** take effect only upon issuance

**105.** 780 P.2d 492, 493–94 (Colo.1989).

**106.** 854 P.2d 217, 223 (Colo.1993); *see also People v. Harding*, 967 P.2d 153, 155 (Colo.1998) (suspending for a year and a day a lawyer who used client funds for his own purposes, knowingly disobeyed a court order, and engaged in conduct prejudicial to the administration of justice, among other misconduct); *People v. Zimmermann*, 922 P.2d 325, 328 (Colo.1996) (suspending for a year and a day a lawyer who, for more than three years, "consistently mismanaged his trust account, commingled funds that should

have been deposited in either his trust *or* his operating account, improperly used clients' funds to pay for personal, office and client expenses, and made refunds of unused advance attorney fees from unrelated client funds" without authorization; the lawyer also failed to correct his practices after the People warned him to do so).

**107.** 911 P.2d 640, 640–41 (Colo.1996).

**108.** *See* C.R.C.P. 251.7(a)(1)-(3).

of an "Order and Notice of Probation." [109].

2. Respondent **SHALL** successfully complete a **SIX–MONTH PERIOD OF PROBATION** subject to the following conditions:

 a. She will commit no further violations of the Colorado Rules of Professional Conduct; and

 b. During her six-month probation, Respondent shall consult monthly with an accounting mentor selected by the People in conjunction with Respondent. The mentoring shall be designed to implement and consistently utilize a system of financial and trust account management practices to minimize the possibility that Respondent's misconduct will reoccur. The mentoring program shall include monthly reviews of Respondent's business and trust accounts. Respondent and the People shall select the accounting mentor and submit a joint monitoring plan for approval by the PDJ **no later than the effective date of the probation.** Also by that date, Respondent shall provide a copy of this opinion to the mentor and execute an authorization for release, requiring the mentor to notify the People if Respondent fails to fully participate in the required mentoring. The mentor shall submit monthly reports to the People and to the PDJ during the period of probation. Respondent shall bear all costs of complying with this condition of probation.

3. Respondent **SHALL** file any post-hearing motion or application for stay pending appeal with the Hearing Board **on or before August 7, 2013.** No extensions of time will be granted. If Respondent files a post-hearing motion or an application for stay pending appeal, the People **SHALL** file any response thereto within seven days, unless otherwise ordered by the PDJ.

4. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fourteen days from the date of this order. Respondent's response to the People's statement, if any, must be filed no later than fourteen days thereafter.

---

**109.** In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.